UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLGA T. GRASSO,

       Plaintiff,

v.                                    Case No. 8:13-cv-3186-T-33AEP

MICHELLE GRASSO and TERESA
GRASSO,

       Defendants.
_____/

## ORDER

This cause is before the Court on Defendants Michelle and Teresa Grasso's Motion for Partial Summary Judgment (Doc. # 92), filed on June 30, 2015. Plaintiff Olga T. Grasso filed a response in opposition on July 30, 2015. (Doc. # 98). Michelle and Teresa[1] filed a reply on August 13, 2015. (Doc. # 106). With leave of Court, Olga filed a sur-reply on August 31, 2015. (Doc. # 112). For the reasons that follow, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

---

[1] Given that all parties have the same surname, the Court will refer to each by their respective first names.

This case arises from a dispute between a grandmother and her daughter-in-law and two granddaughters. (Doc. # 62 at 1-5). The instant case arose when Olga (the grandmother) filed suit on July 16, 2013, against Michelle and Teresa (Olga's granddaughters) in the Sixth Judicial Circuit, in and for Pinellas County, Florida, styled Olga Grasso v. Michelle Grasso and Teresa Grasso, No. 13-007276-CI-07 (the Second State Court Action). (Doc. ## 1, 23). Michelle and Teresa timely removed to this Court on the basis of diversity jurisdiction. (Doc. # 1).

Prior to filing suit against Michelle and Teresa, Olga filed suit against Margaret (Olga's daughter-in-law) and Michelle on February 23, 2011. That prior litigation against Margaret and Michelle was filed in the Sixth Judicial Circuit, in and for Pinellas County, Florida, and was styled Olga Grasso v. Margaret Grasso, individually and as a purported Co-Trustee of the Olga Grasso Revocable Trust and Michelle Grasso, individually and as purported Co-Trustee of the Olga Grasso Revocable Trust, No. 11-001184-ES-3 (the Trust Litigation). (Doc. # 23 at 2).

Before continuing, an introduction to the parties is required. Olga was married to Joseph, Sr., with whom she had two children—Joseph, Jr. and Robert. (Doc. # 92 at ¶ 1).

2

Olga lived in Florida with Joseph, Sr. until his passing on December 25, 2008. (Doc. # 62 at ¶¶ 2, 7-8). Thereafter, Olga temporarily moved to Oklahoma to stay with Joseph, Jr., his wife, Margaret, and his two daughters, Michelle and Teresa. (Id. at ¶ 8; 92 at 1-2).

Olga travelled to Oklahoma to recover after the passing of her husband of 62 years. In other words, Olga went to Oklahoma during a time of emotional despair. See (Doc. # 99-25 at 71:18-25) (stating "you're married 62 years and that was heartbreaking [i.e., the death of her husband] . . . . I had a wonderful husband and I still miss him."). Indeed, Olga was "mourning a lot" and "in deep grief." (Doc. # 99-19 at 5:22-25). Adding to her loss, Olga's son, Joseph Jr., became ill in April of 2010, and passed away on October 3, 2010, from cancer. (Doc. ## 93-1 at ¶ 5; 99-24 at 32:1-2).

While in Oklahoma, Olga was home by herself during the day and would take care of the cats in the house, watch television, and "get things for cooking." (Doc. ## 93-12 at 21:12-16, 22:16-20; 99-23 at 55:1-3). Olga also dusted and made "sure the dishes were gone in the dishwasher"; she further "learned a few things" about the washing machine. (Doc. # 93-12 at 23:9-24:13). And although Olga was able to

cook, she needed help lifting "big pots" and "heavy stuff." (Id. at 25:24-27:22).

Olga did not need help taking a shower, getting dressed, brushing her teeth, eating, or changing her bed-sheets. (Id. at 24:21-25:19). Further, Olga was never under the care of any mental health professional. (Id. at 39:1-40:1).

However, Olga—who was an octogenarian at the time, (Doc. #99-1 at 3) (stating Olga was 86 years-old in 2010)—was not financially sophisticated. (Doc. # 99-16 at 10:5-13) (describing Olga as a "not terribly sophisticated" investor); (Doc. # 99-24 at 17:1-22) (stating Joseph, Sr. took care of most of the family business, set-up the investment accounts, and that "everything was Greek to" Olga); (Doc. # 99-25 at 107:8-25) (stating Olga "never read documents" in response to the question of "Could you [i.e. Olga] read any documents"); (Doc. # 99-23 at 50:1-25) (stating that Olga "couldn't see" and "didn't know what it was" that she was signing when discussing a financial document signed in Margaret's advisor's office); (Doc. # 99-23 at 55:15-56:2) (stating "Q. -- did you [i.e. Olga] do your own banking? A. I did -- no. It got so, I couldn't make out checks. I couldn't see."). In contrast, Michelle and Teresa are both practicing attorneys. (Doc. # 99-7 at 2; 99-22 at 6:25-7:2; 99-30 at 5:18-25).

4

While Olga was able to accompany Margaret to the store at first, Olga stopped such trips because she could not keep up. (Doc. # 99-23 at 55:5-9). Olga also had several health problems: she needed medication for her leg (Doc. # 93-12 at 29:19-30:2); she suffered from eye problems in her right eye due to a prior stroke (Doc. # 99-24 at 60:11-19); and she suffered from a vitreous hemorrhage in her left eye (Doc. # 99-1 at 3). Overall, in February of 2010 Olga's visual acuity was 20/70 (right eye) and 6/200 (left eye) (Id.), in late February, early March of 2010 her vision in the left eye "improved" to 20/200 (Id. at 7), and in January of 2011 her vision was 20/80 (right eye) and 3/200 (left eye) (Id. at 8). Although Olga ordered her medications over the phone, she required assistance in picking-up the medicine because she could not drive. (Doc. # 93-12 at 30:3-25; 99-22 at 81:8-10; 99-24 at 29:2-5).

Compounding her vision problems, Olga's ambulatory capabilities were limited. Olga required a cane to walk most of the time. (Doc. # 99-25 at 111:2-19). Furthermore, Olga could not use the stairs and, thus, was limited to the downstairs of the house. (Id. at 36:1-4, 111:14-19). In addition, Olga stopped getting the mail from outside (Id. at 108:16-109:3), and she was accompanied by her grandson on her

trip back to Florida in 2010, because her family was afraid she would fall (Id. at 109:10-20).

Olga also executed several estate planning documents. (Doc. ## 62 at ¶ 22; 92 at ¶¶ 7, 9). The first of these documents was Olga's will, which was drafted by Teresa in March of 2010. (Doc. ## 99-2; 99-30 at 42-44). Then, on August 18, 2010, Olga executed the first power of attorney, which became effective upon signing. (Doc. # 99-3). The first power of attorney named Michelle as Olga's attorney in fact, and granted Michelle "the full power and authority to manage and conduct all of [Olga's] affairs, and to exercise [Olga's] rights and powers." (Id. at ¶ 2). Shortly afterwards, on September 20, 2010, The Olga Grasso Revocable Living Trust was created; Olga was named as the Grantor and Trustee. (Doc. # 99-6). However, within "a few days," Michelle was named a Trustee of The Olga Grasso Revocable Living Trust. (Doc. # 99-17 at 51-52).

On October 12, 2010, Olga signed the second power of attorney; however, by its terms, it was not to become effective until Olga was declared incapable of handling her finances or personal affairs, to be determined by judicial decree or letter from her attending physician. (Doc. # 62-3). This second power of attorney named Margaret as the

principal attorney in fact, as well as Michelle and Teresa as secondary co-attorneys in fact should Margaret refuse or become unable to serve as the attorney in fact. (Id.)

It was not long after that another change occurred. On November 15, 2010, The Olga Grasso Revocable Living Trust was amended. (Doc. # 99-8). The First Amendment to The Olga Grasso Trust stated that Olga was the Grantor and Michelle was the Trustee. (Id.). Additionally, The First Amendment altered the Trust such that it became irrevocable; the Trust's title now read The Olga Grasso Trust. (Id.).

Overall, Olga stayed in Oklahoma from April of 2010 to December of 2010. (Doc. # 93-2 at ¶ 2). Once Olga returned to Florida that December she revoked all estate planning documents executed in Oklahoma. (Doc. ## 93-4; 93-5).

B.   **Procedural Background**

Olga first sued Margaret (her daughter-in-law) and Michelle (her granddaughter) in the Trust Litigation, which resulted in the termination of the Trust created while Olga lived in Oklahoma. (Doc. # 92 at 3). The trial court in the Trust Litigation also entered an award for attorney's fees against Margaret and Michelle, in their individual capacities, which Margaret and Michelle appealed.

In between the filing of Margaret and Michelle's appeal to the Second District Court of Appeal and the Second District Court of Appeal's decision, Olga filed the Second State Court Action against Michelle and Teresa on July 16, 2013. (Doc. # 1-1). Michelle and Teresa timely removed to this Court on the basis of diversity jurisdiction. (Doc. # 1). It is the Second State Court Action from which this removed action arises.

The parties subsequently filed an Agreed Joint Motion to Stay Case, pending the Second District Court of Appeal's ruling. (Doc. # 23). This Court granted the Joint Motion to Stay and administratively closed the case pending the resolution of the state court proceedings. (Doc. # 26). On August 5, 2015, the parties filed a Joint Status Report indicating the proceedings in the Second District Court of Appeal had concluded. (Doc. ## 28-29). The Second District Court of Appeal reversed the Trust Litigation court's award of attorney's fees against Margaret and Michelle reasoning that they had not been parties to the Trust Litigation in their individual capacities. (Doc. # 92 at 5). This Court re-opened the instant case and directed Michelle and Teresa to file a response to Olga's Amended Complaint. (Doc. # 35).

In response to the Complaint, Michelle and Teresa filed a Motion to Dismiss on September 5, 2014, asserting, among

8

other things, a res judicata argument. (Doc. # 41). This Court denied, in part, Michelle and Teresa's Motion to Dismiss and reserved ruling on the res judicata argument pending a hearing. (Doc. # 56). After holding a hearing to determine the res judicata issue, this Court denied the Motion to Dismiss in its entirety (Doc. ## 60-61).

With leave of Court, Olga filed an Amended Complaint. (Doc. # 62). The Amended Complaint asserts five counts: Exploitation of the Elderly (Count I); Civil Remedy for Exploitation of an Elderly Person (Count II); Breach of Fiduciary Duty (Count III); Constructive Fraud (Count IV); and Replevin (Count V). (Doc. # 62). Michelle and Teresa filed their Answer on December 31, 2014. (Doc. # 63).

On June 30, 2015, Michelle and Teresa filed the present Motion for Partial Summary Judgment as to (A) whether Olga may recover attorney's fees arising from the Trust Litigation in this action; (B) Count I of the Amended Complaint; and (C) Count III of the Amended Complaint. (Doc. # 92). The Motion is ripe for the Court's review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590,

593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III.  **Analysis**

   A.   **Attorney's Fees in the Trust Litigation**

      i.   **Propriety of the arguments before the Court**

In their reply, Michelle and Teresa raise arguments not asserted in their Motion. Compare (Doc. # 92 at 5-6) (the Motion), with (Doc. # 106 at 1-3) (the reply). Olga filed a

Motion to Strike, arguing Michelle and Teresa cannot assert a new legal argument in reply, and a Motion for Leave to File Sur-Reply. (Doc. ## 107-108). This Court denied the Motion to Strike, but granted the Motion to File Sur-Reply. (Doc. # 109).

Now with the benefit of having read an in-depth reply and sur-reply, it is apparent that Michelle and Teresa should not be permitted to raise a new argument in their reply. In their Motion for Partial Summary Judgment, Michelle and Teresa argue this Court should not award attorney's fees against them because to do so would undermine the Second District Court of Appeal's conclusion that Michelle was not a party in her individual capacity to the Trust Litigation. (Doc. # 92 at 6). Then, in their reply, Michelle and Teresa argue Olga failed to sufficiently plead entitlement to attorney's fees under the wrongful act doctrine. (Doc. # 106 at 1-4). Olga's sur-reply highlights that the thrust of Michelle and Teresa's new argument is aimed at the sufficiency Olga's pleading. (Doc. # 112 at 2-3). Thus, Michelle and Teresa's argument turned from one based on the rationale that this Court should not undermine the ruling of another court to one attacking the sufficiency of Olga's pleading in her Amended Complaint.

As the Eleventh Circuit has "repeatedly . . . admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." Herring v. Sec'y, Dept. of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005); see also United States v. Whitesell, 314 F.3d 1251, 1256 (11th Cir. 2002) (stating a court need not address issue raised for first time in reply brief). As such, "District Courts, including this one, ordinarily do not consider arguments raised for the first time on reply." Allah El v. Avesta Homes, No. 8:11-cv-2192-T-33TGW, 2012 WL 515912, at *3 (M.D. Fla. Feb. 16, 2012). In fact, the case reporters are replete with cases wherein courts declined to consider arguments raised for the first time in a reply. See Parker City Water Auth., Inc. v. N. Fork Apartments, L.P., No. 09-0240-WS-M, 2009 WL 4898354, at *1 n. 2 (S.D. Ala. Dec. 14, 2009) (collecting over 40 cases). Accordingly, in resolving the pending Motion, the Court limits its analysis to the argument raised in the Motion. However, Michelle and Teresa may, by appropriate motion, raise the issue of whether Olga sufficiently pled entitlement to attorney's fees pursuant to the wrongful act doctrine at trial.

## ii.  The wrongful act doctrine

Florida follows the American Rule: a party may be awarded attorney's fees only when authorized under a statute or by agreement of the parties. Trytek v. Gale Indus. Inc., 3 So. 3d 1194, 1198 (Fla. 2009). However, there is "a very narrow exception to the American Rule," City of Tallahassee v. Blankenship & Lee, 736 So. 2d 29, 30 (Fla. 1st DCA 1999)—the wrongful act doctrine. The wrongful act doctrine applies when

> the wrongful act of the defendant has involved the claimant in litigation with others, and has placed the claimant in such relation with others as makes it necessary to incur expenses to protect its interests, such costs and expenses, including reasonable attorney's fees upon appropriate proof, may be recovered as an element of damages.

Schwartz v. Bloch, 88 So. 3d 1068, 1071 (Fla. 4th DCA 2012); see also Reiterer v. Monteil, 98 So. 3d 586, 587 (Fla. 2d DCA 2012) (defining the wrongful act doctrine); State Farm Fire & Cas. Co. v. Pritcher, 546 So. 2d 1060, 1061-62 (Fla. 3d DCA 1989) (same).

Michelle and Teresa argue Olga should be barred from recovering attorney's fees arising from the Trust Litigation because the Second District Court of Appeal held that Margaret and Michelle were not sued in their individual capacities. (Doc. # 92 at 6). In contrast, Olga argues it is precisely

14

because Michelle was sued only in her capacity as a co-trustee in the Trust Litigation that allows for the application of the wrongful act doctrine. (Doc. # 98 at 6-7). The Court construes these arguments to be focused on the third-party element of the wrongful act doctrine.

This Court previously recognized that the Second District Court of Appeal held Margaret and Michelle were sued only in their capacities as co-trustees. (Doc. # 61 at 6). Furthermore, the Court notes Margaret is not a party to the instant action in any capacity. See generally, (Doc. # 62). Therefore, the third-party element of the wrongful act doctrine is satisfied. Accordingly, the Court denies Michelle and Teresa's Motion as to the issue of attorney's fees incurred from the Trust Litigation. As stated, however, Michelle and Teresa may, by appropriate motion, raise the issue of whether Olga sufficiently pled entitlement to attorney's fees pursuant to the wrongful act doctrine at trial.

B.    **Exploitation of the Elderly (Count I)**

In Count I of her Amended Complaint, Olga asserts a claim for exploitation under Florida's Adult Protective Services Act, §§ 415.101—415.113, Florida Statutes. To succeed on her

exploitation claim, Olga must establish that she was a "vulnerable adult" and "exploited."

Florida's Adult Protective Services Act provides a civil cause of action for a "vulnerable adult who has been abused, neglected, or exploited as specified in this chapter . . . against any perpetrator and may recover actual and punitive damages for such abuse, neglect, or exploitation." Fla. Stat. § 415.1111 (2014). A "vulnerable adult" is defined as

> a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of old age.

§ 415.102(27).[2] Furthermore, "exploitation" is defined to mean:

> a person who:
> 1. **Stands in a position of trust and confidence with a vulnerable adult** and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult; or

---

[2] Section 415.102 was subsequently renumbered in 2015 so that "vulnerable adult" is now defined at Section 415.102(28). State Ombudsman Program-Citizens and Citizenship-Councils, 2015 Fla. Sess. Law Serv. Ch. 2015-31 (West).

> 2. **Knows or should know that the vulnerable adult lacks the capacity to consent**, and obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult.

§ 415.102(8)(a) (emphasis added).

And, although "perpetrator" is not defined, the definition of "alleged perpetrator" is instructive. "Alleged perpetrator" is defined to mean "a person who has been named by a reporter as the person responsible for abusing, neglecting, or exploiting a vulnerable adult." § 415.102(3). Thus, a "perpetrator" is one who is responsible for abusing, neglecting, or exploiting a "vulnerable adult."

Having laid the statutory framework, the Court will address each of Michelle and Teresa's arguments in turn.

### i. Whether Olga is a Vulnerable Adult

Michelle and Teresa argue Olga is not a "vulnerable adult," and rely on Watson v. State, 95 So. 3d 977 (Fla. 2d DCA 2012), for support. (Id. at 15). In Watson, the Second District Court of Appeal construed the term "elderly person," as defined in Florida's Abuse, Neglect, and Exploitation of Elderly Persons and Disabled Adults statute, §§ 825.101–

825.106, Florida Statutes. According to Michelle and Teresa, the Second District Court of Appeal's construction of Section 825.101(4) shows, by way of comparison, that Olga was not a "vulnerable adult," as defined by Section 425.101(27). (Id. at 14-16). To be clear, though, the relevant statute on the "vulnerable adult" issue is Section 425.101(27), not Section 825.101(4).

Thus, Michelle and Teresa's reliance on Watson does not take them very far. First, Watson construed a different statute than the one relevant to this case. 95 So. 3d at 979. Section 825.101(4), which is part of Florida's Abuse, Neglect, and Exploitation of Elderly Persons and Disabled Adults statute, defines "elderly person" to mean:

> a person 60 years of age or older who is suffering from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunction, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired.

In contrast, Florida's Adult Protective Services Act, which is the statute Olga brought suit under in Count I (Doc. # 62 at ¶ 40), defines "vulnerable adult" to mean:

> a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or

18

> dysfunction, or brain damage, or the infirmities of old age.

§ 425.101(27). As is evident, Sections 825.101(4) and 415.102(27) define two different terms and are parts of two different statutory schemes.

Second, to the extent the Second District Court of Appeal's construction of Section 825.101(4) is a suitable comparator, Watson weighs in favor of Olga. In Watson, the putative "elderly person" was a 79 year-old man who had undergone several invasive surgeries and yet still played tennis on a limited basis, rode a bicycle to stay in shape, did not need assistance in walking, and lived an independent lifestyle. 95 So. 3d at 979.

Michelle and Teresa attempt to draw a comparison, which weighs in their favor, between Watson's putative "elderly person" and Olga by relying on the fact that Olga was often home alone during her time in Oklahoma. (Doc. # 93-12 at 22:16-20). Michelle and Teresa further rely on the fact that Olga would take care of the cats in the house, watch television, and cook to show that Olga was not vulnerable. (Id. at 21:12-16, 22:16-20); see also (Doc. # 99-23 at 55:1-3). In addition, Michelle and Teresa cite to the fact that Olga made "sure the dishes were gone in the dishwasher,"

"learned a few things about the washing machine," and dusted to show that Olga was not vulnerable. (Doc. # 93-12 at 23:9-24:13).

By comparison, Olga points to record evidence showing that she was 86 years-old in 2010 (Doc. # 99-1 at 3), her ambulatory capabilities were diminished to the point that she required a cane most of the time (Doc. # 99-25 at 111:2-13), and she could not walk upstairs (Id. at 36:1-4 at 111:14-19). Olga also had severe vision impairments (Doc. # 99-1), and stated "I never read documents" when asked if she "read any documents." (Doc. # 99-25 at 107:16-18). Furthermore, Olga could not drive herself and required help in picking up her medications. (Doc. # 99-22 at 81:8-10; 99-24 at 29:2-5); see also (Doc. # 93-12 at 30:3-25).

More importantly, Olga's vulnerability stemmed from her emotional state and level of financial sophistication. With respect to her emotional state, Olga provides record evidence showing she was "mourning a lot" and "in deep grief" after her husband of 62 years passed away. (Doc. # 99-19 at 5:22-25); see also (Doc. # 99-25 at 71:18-25). Then, not two years after losing her husband, Olga suffered another loss. Following approximately 6 months of being ill, Joseph Jr.

passed away on October 3, 2010, from cancer. (Doc. ## 93-1 at ¶ 5; 99-24 at 32:1-2).

In addition, Olga cites to record evidence showing she was not financially sophisticated. (Doc. # 99-16 at 10:5-13). Olga did not set-up any of her financial accounts or manage the family business; in fact, Olga characterizes her understanding of the financial accounts by stating, "everything was Greek to me." (Doc. # 99-24 at 17:1-22). Finally, Olga could not read financial and legal documents and required help in simply writing a check. (Doc. ## 99-23 at 55:20-56:2; 59:24-60:8; 99-25 at 107:8-25).

The cumulative effect of the foregoing record evidence establishes a genuine issue of material fact as to whether Olga was a "vulnerable adult." Accordingly, Michelle and Teresa's Motion is denied on this issue.

### ii.  Michelle and Teresa as Olga's Caregivers

Michelle and Teresa further argue Olga must also show they were her "caregivers." For support, Michelle and Teresa cite Bohannon v. Shands Teaching Hospital and Clinic, Inc., 983 So. 2d 717, 721 (Fla. 1st DCA 2008). (Doc. # 92 at 6-7). In particular, they rely on the following quote from Bohannon:

> To state a cause of action under section 415.1111,
> a complaint must set forth factual allegations
> which demonstrate that the plaintiff or the

> plaintiff's decedent was a "vulnerable adult" as defined by section 415.102(27), that the defendant was a "caregiver" as defined by section 415.102(4), and that the defendant committed "abuse" as defined by section 415.102(1), or "neglect" as defined by section 415.102(15), or "exploitation" as defined by section 415.102(7) with respect to the vulnerable adult.

983 So. 2d at 721. Nevertheless, Bohannon is not controlling. First, Bohannon is distinguishable from the instant case and, second, the plain language of Section 415.1111 does not require that Olga establish Michelle and Teresa were her "caregivers."

Bohannon is distinguishable because the complaint in that case alleged the defendant's "conduct constituted 'abuse'" as defined by Section 415.102(1). 983 So. 2d at 720. "Abuse" is defined as "any willful act or threatened act by a relative, caregiver, or household member which causes or is likely to cause significant impairment to a vulnerable adult's physical, mental, or emotional health." Fla. Stat. § 415.102(1). Thus, a plaintiff alleging "abuse" must establish the defendant is a relative, caregiver, or household member.

In contrast, the Amended Complaint in this case alleges Michelle and Teresa exploited Olga. (Doc. # 62 at 6). Section 415.1111 provides a cause of action for a "vulnerable adult who has been abused, neglected, or exploited . . . against

any perpetrator . . . ." A "perpetrator" is a person who is responsible for abusing, neglecting, or exploiting a vulnerable adult. See § 415.102(3). The following persons are statutorily capable of exploiting a "vulnerable adult": "a person who[] (1) [s]tands in a position of trust and confidence with a vulnerable adult . . . or (2) [k]nows or should know that the vulnerable adult lacks the capacity to consent . . . ." § 415.102(8)(a); cf. § 415.102(1) (stating that abuse is committed by a "relative, caregiver, or household member").

Furthermore, nothing within the Legislature's enacted statement of intent indicates actions alleging "exploitation" may only be brought against "caregivers." § 415.101. As such, the plain language of Section 415.1111 does not require that a "perpetrator" who exploited a "vulnerable adult" be a "caregiver." This Court must give effect to the plain language of the statute. Knowles v. Beverly Enters.-Fla., Inc., 898 So. 2d 1, 5 (Fla. 2004) (stating courts are to first look at the statute's plain meaning); State v. Jett, 626 So. 2d 691, 692 (Fla. 1993) (stating "It is a settled rule of statutory construction that unambiguous language is not subject to judicial construction . . ."). Accordingly, Olga was not required to establish that Michelle and Teresa were her

23

"caregivers." Therefore, Michelle and Teresa's Motion as to Count I, based on the argument that they were not "caregivers," is denied.

### C. Breach of Fiduciary Duty (Count III)

Michelle and Teresa argue they are entitled to summary judgment as to Olga's breach of fiduciary duty claim, as asserted in Count III. In short, Michelle and Teresa argue Olga's breach of fiduciary duty claim arises solely from the power of attorney attached to the Amended Complaint as Exhibit C. (Doc. # 92 at 17).

In contrast, Olga asserts the source of the fiduciary duty was not limited to the power of attorney attached to the Amended Complaint as Exhibit C. Rather, Olga argues as to Michelle that the fiduciary duty also arose from (1) a power of attorney signed on August 18, 2010; (2) a Fiduciary Certification signed by Michelle on November 16, 2010; and (3) when Olga asked Michelle to restyle her assets under the name of a trust account, which Michelle did. (Doc. # 98 at 16–19) (citing, e.g., Doc. 99-21 at 25:7-20, 26:22–27:5); see also (Doc. ## 99-3; 99-14). As to Teresa, Olga asserts a fiduciary relationship existed because (1) Teresa drafted Olga's will; (2) Teresa worked with an advisor for one of Olga's accounts when Michelle was unavailable; and (3) a

relationship of trust existed between Teresa and Olga. (Doc. ## 98 at 18; 99-28 at 128:17-20).

On this point, the Court finds instructive Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1296-97 (11th Cir. 2006). The complaint in Hurlbert asserted interference and retaliation claims under the Family Medical Leave Act of 1993. Id. at 1292-93. The defendant moved for summary judgment and the plaintiff asserted two arguments in support of the interference claim. Id. at 1296. In relevant part, the district court rejected one of the plaintiff's arguments; namely, that he was entitled to FMLA leave to care for his mother. Id. The Eleventh Circuit affirmed and reasoned the complaint only pled an interference claim predicated on the plaintiff's health conditions, not those of his mother. Id. at 1297. Thus, allowing the plaintiff to assert new grounds for the interference claim would "reflect a fundamental change." Id.

Likewise, in Thews v. Wal-Mart Stores, Inc., 560 Fed. Appx. 828, 830 (11th Cir. 2014), the court refused to allow a party to assert a new theory of liability at summary judgment. In Thews the complaint specifically alleged six theories by which Wal-Mart was putatively liable; however, none of those six theories included an allegation of vicarious

25

liability. Id. at 829-30. Furthermore, the fact that the complaint contained some suggestion of vicarious liability was non-consequential because those suggestions were alleged in the factual background and not as part of the cause of action. Id.

District courts also have refused to allow parties to assert new theories of liability at summary judgment. For example, in Coquina Investments v. Rothstein, No. 10-60786-Civ., 2011 WL 4971923, at *11 (S.D. Fla. Oct. 19, 2011), the complaint brought a claim for, among other things, racketeering. To show liability, the plaintiff was required to plead either an "open-ended" or "close-ended" pattern of racketeering. Id. at *11. The plaintiff limited its theory of liability to a "closed-ended" pattern by specifically pleading that defendants had engaged in a pattern of acts over a substantial, but closed, period of time. Id. At summary judgment the plaintiff argued it could also show liability under an "open-ended" theory. Id. The district court rejected that argument as inconsistent with binding precedent. Id.; see also Wilcox v. Green Tree Servicing, LLC, No. 8:14-cv-1681-T-24TGW, 2015 WL 2092671, at *1-2 (M.D. Fla. May 5, 2015) (stating "the Court can only consider the claims and theories of liability that Plaintiff pled in her complaint").

26

Similarly here, as in <u>Coquina</u> where the complaint limited the theory of liability and thus precluded the plaintiff from asserting a different theory at summary judgment, the Amended Complaint limited the theory of liability asserted by Olga. Paragraphs 69-76 of the Amended Complaint constitute Count III. (Doc. # 62). Although Paragraph 69 incorporates by reference Paragraphs 1-38, which include allegations that Teresa drafted a will for Olga and Michelle became an attorney in fact on August 18, 2010, (<u>Id.</u> at ¶¶ 14-16, 22-23), Paragraph 70 limited the theory of liability asserted by Olga.

Paragraph 70 reads:

> This is an action for breach of fiduciary duty owed by Defendants, MICHELLE and TERESA, as Co-Attorneys-in-Fact, to OLGA, as principal of the power of attorney. A copy of the power of attorney is attached hereto as **Exhibit "C."**

(Doc. # 62 at ¶ 70) (capitalization and bolding in original). The most natural reading of Paragraph 70, even when taken in context of Paragraphs 1-38 and the remaining Paragraphs of Count III, is that Olga seeks to impose liability for breach of Michelle and Teresa's respective fiduciary duties created by the power of attorney attached as Exhibit C to the Amended Complaint. The conclusion that Paragraph 70 limited Olga's chosen theory of liability to the one articulated in Paragraph

70 is supported by the fact that, despite referencing two powers of attorney in the Amended Complaint, (Doc. # 62 at ¶¶ 22-23, 70), only one is attached the Amended Complaint—specifically, the power of attorney referenced in Paragraph 70 as Exhibit C. <u>See</u> <u>generally</u> (Doc. # 62).

Therefore, Olga cannot now seek to amend her Amended Complaint, via argument at summary judgment, to include different theories of how Michelle and Teresa's alleged fiduciary duties arose. <u>See</u> (Doc. # 43 at 1) (this Court's Case Management and Scheduling Order setting a deadline of October 1, 2014, for amending pleadings); <u>Gilmour v. Gates, McDonald and Co.</u>, 382 F.3d 1312, 1315 (stating "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment").[3] Thusly limited to her theory of liability advanced in Paragraph 70, Olga must show the following three elements to succeed on a breach of fiduciary duty claim: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) that the breach proximately caused her damages. <u>Gracey v. Eaker</u>, 837 So. 2d 348, 354 (Fla. 2002).

---

[3] In her sur-reply (Doc. # 112) Olga requests this Court grant leave to amend her Amended Complaint rather than grant summary judgment in favor of Michelle and Teresa. The Court denies Olga's request for alternative relief. <u>See</u> (Doc. # 43).

The power of attorney attached as Exhibit C was only to become effective "as of the date of [Olga's] incapacity . . . [to] be determined either by judicial decree or by a letter from [her] attending physician . . . ." (Doc. # 93-13 at 2). Olga, however, stated in a deposition she was never determined by judicial decree or letter from her attending physician to be incapable of handling her financial affairs (Doc. # 93-12 at 39:1-40:1, 83:22-85:2). Therefore, the power of attorney attached as Exhibit C never became effective. In addition, Olga has not directed the Court to record evidence creating a genuine issue of material fact. See (Doc. # 98 at 15-19) (advancing alternative theories as to how the fiduciary duties arose rather than pointing to record evidence establishing a genuine issue of material fact). As such, summary judgment is granted in Michelle and Teresa's favor as to Count III for breach of fiduciary duty.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants Michelle and Teresa Grasso's Motion for Partial Summary Judgment (Doc. # 92) is **DENIED** as to Olga Grasso's claim to attorney's fees arising from the Trust Litigation.

(2)   Defendants  Michelle  and  Teresa  Grasso's  Motion  for
      Partial  Summary  Judgment  (Doc. # 92)  is  **DENIED**  as  to
      Count I.

(3)   Defendants  Michelle  and  Teresa  Grasso's  Motion  for
      Partial  Summary  Judgment  (Doc. # 92)  is  **GRANTED**  as  to
      Count III.

      **DONE**  and  **ORDERED**  in  Chambers  in  Tampa,  Florida,  this
17th day of September, 2015.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record

30