UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLGA T. GRASSO,

        Plaintiff,

v.                         Case No. 8:13-cv-3186-T-33AEP

MICHELLE GRASSO, and
TERESA GRASSO,

        Defendants.
_____/

**ORDER**

    This matter comes before the Court in consideration of Defendants Michelle Grasso and Teresa Grasso's Motion for Judgment as a Matter of Law (Doc. ## 163, 176). Plaintiff Olga T. Grasso filed a response. (Doc. # 179). With leave of Court, Michelle and Teresa filed a reply. (Doc. ## 180, 181, 182). For the reasons set forth herein, the Court denies the Motion.

**I.**    **Background**

    This case arises from a dispute between a grandmother and two granddaughters. (Doc. # 62 at 1-5). Olga was born in November of 1923, which means she was 86-years old in 2009, and 92-years old at the time of trial. Tr. Transcript, vol. 2, at 73:21-24. Olga and her husband, Joseph Frank Grasso

1

(Joe Sr.), had two sons, Robert Grasso and Joseph Jr. Grasso (Joe Jr.). [1] Id. at 76:5-12. Joe Jr. was married to Margaret Grasso, with whom he had three children: Michelle, Teresa, and Michael Grasso. Tr. Transcript, vol. 4, at 7:18-8:2. Michelle and Teresa are the Defendants in this case.

### A.   Pertinent Family History

Olga and Joe Sr. owned a motel on Clearwater Beach, Florida. Tr. Transcript, vol. 2, at 76:16-20. The motel was eventually sold for $1.5 million. Id. at 202:1-2, 8-9. According to Robert, the proceeds of the sale were originally to be split evenly between himself and Joe Sr., but the distribution plan changed so that Robert, Joe Sr., and Joe Jr. would each receive a third of the proceeds. Id. at 202:16-17, 203:3-204:9. A dispute then arose between Robert, Joe Sr., and Joe Jr., which resulted in Robert no longer speaking with his father. Id. at 204:10-205:20. Joe Sr. passed away thereafter, in December of 2008. Id. at 78:4-12.

Shortly before Joe Sr. died, Joe Jr. took over a pending lawsuit in New York state court between Joe Sr. and Nick Grasso, Joe Sr.'s brother. Tr. Transcript, vol. 3, at 35:3-36:18. Then, in December of 2009, Nick filed suit against

---

[1] The Court will refer to people having the same last name by first name in order to avoid confusion.

Olga, Joe Sr.'s estate, Joe Jr., Michelle, and Teresa. Id. at 87:2-9; Tr. Transcript, vol. 4, at 115:19-116:3. These lawsuits related to property disputes between Joe Sr. and Nick. Tr. Transcript, vol. 4, at 114:11-115:18. During the state court litigation in New York, Joe Jr. asked Robert to sign an affidavit; however, Robert refused and, in the end, signed an affidavit stating as much. Tr. Transcript, vol. 2, at 212:25-217:22. According to Teresa, it was because of the effects of Robert's affidavit in the New York state litigation that Olga sought to disinherit Robert from her will. Tr. Transcript, vol. 3, at 90:2-94:25. Olga, however, testified that she never wrote a letter explaining that she wanted to disinherit Robert. Tr. Transcript, vol. 2, at 79:6-80:1.

Teresa drafted a will for Olga. Tr. Transcript, vol. 3, at 104:5-105:12. The will drafted by Teresa explicitly disinherited Robert. (Pl.'s Ex. 20). Olga executed the will on March 10, 2010, (Id. at 2), in her condominium in Florida and, according to her brother, Frank Ciolli, she did so without reading it. Tr. Transcript, vol. 3, at 10:7-8, 15:3-5, 17:15-20.

In the spring of 2009, after her husband's death, Olga went with Joe Jr. to live with him in Oklahoma. Tr. Transcript, vol. 4, at 108:22-25. Testimony at trial

3

established that Olga used a cane or walker. Tr. Transcript, vol. 2, at 38:5-15. However, Michelle testified that Olga only used a cane. Tr. Transcript, vol. 4, at 109:19-25. In any event, Olga was confined to the down-stairs portion of the house while in Oklahoma. Tr. Transcript, vol. 2, at 127:15-16. Michelle even testified that in preparing for Olga's arrival, she and Teresa chose the bedroom on the first floor for safety reasons. Tr. Transcript, vol. 4, at 109:8-13. Furthermore, Michelle and Teresa told Olga not to walk to the mailbox because she was likely to fall. Tr. Transcript, vol. 2, at 97:8-11, 127:6-7.

Olga also had sensory impairments. As to hearing, Daniel C. Fuller, Olga's former grandson-in-law with whom she remains in contact, Tr. Transcript, vol. 1, at 67:4-22, testified that Olga's hearing was "terrible" when she returned from Oklahoma, Tr. Transcript, vol. 2, at 37:21-24. Likewise, Robert testified that Olga's hearing was "no good" when she returned to Florida. Id. at 221:8-16. Olga also provided testimonial evidence implying that Michelle and Teresa were aware of her impaired ability to hear. See Id. at 97:7-11.

With respect to Olga's vision, the reports of Olga's eye doctor, Dr. Steven M. Cohen, established that Olga's vision

4

worsened over time. Olga's visual acuity in February of 2010, was 6/200 (left eye) and 20/70 (right eye), and in January of 2011, and her visual acuity was 3/200 (left eye) and 20/80 (right eye). (Pl.'s Ex. 90). Dr. Cohen's reports also demonstrate that Olga suffered from age-related macular degeneration and a vitreous hemorrhage in her left eye. (Id.).

Olga testified that her vision was the same at trial as it was while she was in Oklahoma. Tr. Transcript, vol. 2, at 108:8-109:4. Olga also explicitly stated that "she could not see" and "couldn't go around reading anything." Id. at 107:20-23, 127:3-7. Fuller, Robert, Ciolli, and Joseph W. Fleece III, Olga's former attorney, Tr. Transcript, vol. 3, at 249:20-253:17, all testified that Olga had difficultly seeing. Tr. Transcript, vol. 2, at 37:3-10, 276:11-12; Tr. Transcript, vol. 3, at 22:16-17, 273:21-25; cf. Tr. Transcript, vol. 2, at 100:12-24.

While living in Oklahoma, Olga executed several estate planning documents. On August 18, 2010, Olga executed a durable power of attorney that named Michelle as her attorney in fact. (Pl.'s Ex. 22). Then on September 20, 2010, Olga executed a revocable trust, which named Olga as both grantor and trustee. (Pl.'s Ex. 26). There is a second revocable trust also dated September 20, 2010, except the second revocable

trust named Olga and Margaret as trustees. (Pl.'s Ex. 35).
Olga also signed a durable power of attorney on October 12,
2010, naming Margaret as her attorney in fact, along with
Michelle and Teresa as successor attorneys in fact. (Pl.'s
Ex. 36). The October 12, 2010, durable power of attorney was
only to become effective upon the date of Olga's incapacity.
(Id.).

Joe Jr. passed away while Olga was living in Oklahoma.
Tr. Transcript, vol. 3, at 112:23-25 (showing that Joe Jr.
died on October 3, 2010). Olga testified that the deaths of
her husband and son had a profound impact on her. Tr.
Transcript, vol. 2, at 78:21-23, 92:12-93:13. Teresa
testified that Olga was grieving, Tr. Transcript, vol. 3, at
113:22-25, and Fuller testified that Olga was in a state of
deep grief after the passing of her husband, Tr. Transcript,
vol. 1, at 77:4-8. Olga lost 50 pounds while in Oklahoma and
looked "unhealthy" and "like a skeleton" when she returned to
Florida. Tr. Transcript, vol. 2, at 36:1-8, 221:8-12.

After Joe Jr. passed, Michelle requested that any CDs
Olga held with Wachovia be made transferable on death into
Olga's trust. (Pl.'s Ex. 39). Olga's trust was also amended
so that it became irrevocable and named Michelle as trustee.
(Pl.'s Exs. 46, 47). In addition, Michelle authored a letter

and an email stating that Olga's trust was made irrevocable, both of which use the pronoun "we" in describing who effected the change. (Pl.'s Exs. 53, 89 at 93). Furthermore, the billing records of Erin Donovan, the attorney who drafted Olga's trust documents, show that Donovan spoke with Michelle and Teresa regarding Olga's trusts. (Pl.'s Ex. 55); Tr. Transcript, vol. 3, at 118:24-119:9; Tr. Transcript, vol. 4, at 17:16-19:5.

Michelle also requested that Olga's bank issue a debit card in Michelle's name that was linked to Olga's checking account. (Pl.'s Ex. 54). Additionally, Teresa admits to removing Olga's will from Olga's condominium in Florida. Tr. Transcript, vol. 3, at 105:13-19. Moreover, Teresa attempted to aid Michelle in her capacity as trustee during the Trust Litigation. Tr. Transcript, vol. 4, at 28:8-16.

When Olga returned to Florida, she retained Fleece as counsel. Tr. Transcript, vol. 3, at 239:2-253:17. Before filing suit, Fleece sent a letter to Margaret and Michelle asking them to voluntarily return Olga's money. Id. at 251:1-18. Michelle sent a reply letter in which she refused to return Olga's money and maintained her position as sole trustee. Id. at 252:4-11.

Olga filed suit against Margaret and Michelle on February 23, 2011. That prior litigation against Margaret and Michelle was filed in the Sixth Judicial Circuit, in and for Pinellas County, Florida, and was styled Olga Grasso v. Margaret Grasso, individually and as a purported Co-Trustee of the Olga Grasso Revocable Trust and Michelle Grasso, individually and as purported Co-Trustee of the Olga Grasso Revocable Trust, No. 11-001184-ES-3 (the Trust Litigation). (Doc. # 23 at 2). The Trust Litigation resulted in the termination of the trust created while Olga lived in Oklahoma. (Pl.'s Ex. 86 at 5). The trial court in the Trust Litigation also entered an award of attorney's fees against Margaret and Michelle, in their individual capacities, which Margaret and Michelle appealed.

## B.   Procedural History of the Instant Lawsuit

In between the filing of Margaret and Michelle's appeal to the Second District Court of Appeal and the Second District Court of Appeal's decision, Olga filed a second action in state court, this time against Michelle and Teresa, on July 16, 2013. (Doc. # 1-1). Michelle and Teresa timely removed to this Court on the basis of diversity jurisdiction. (Doc. # 1). It is the second state court action from which this removed action arises.

8

Upon the motion of the parties, this case was stayed and administratively closed pending resolution of the state court proceedings. (Doc. ## 23, 26). On August 5, 2014, the parties filed a Joint Status Report indicating the proceedings in the Second District Court of Appeal had concluded. (Doc. # 29). The Second District Court of Appeal reversed the Trust Litigation court's award of attorney's fees against Margaret and Michelle, reasoning that they had not been parties to the Trust Litigation in their individual capacities. (Pl.'s Ex. 88).

This Court reopened the instant case and directed Michelle and Teresa to file a response to Olga's Amended Complaint. (Doc. # 35). Michelle and Teresa filed a motion to dismiss on September 5, 2014, asserting, among other things, a *res judicata* argument. (Doc. # 41). The Court denied in part Michelle and Teresa's motion to dismiss and reserved ruling as to the *res judicata* argument pending a hearing. (Doc. # 56). After holding a hearing on the *res judicata* issue, the Court denied the motion to dismiss in its entirety (Doc. ## 60, 61).

Olga filed an Amended Complaint on December 3, 2014. (Doc. # 62). The Amended Complaint asserts five counts: Exploitation of the Elderly (Count I); Civil Remedy for

9

Exploitation of an Elderly Person (Count II); Breach of Fiduciary Duty (Count III); Constructive Fraud (Count IV); and Replevin (Count V). (Id.). Michelle and Teresa filed their Answer on December 31, 2014. (Doc. # 63).

Thereafter, Michelle and Teresa moved for partial summary judgment. (Doc. # 92). The Court granted in part and denied in part the motion for partial summary judgment. (Doc. # 119). Specifically, the Court denied the motion for partial summary judgment as to Olga's claim to attorney's fees arising from the Trust Litigation and as to Count I, but granted the motion for partial summary judgment as to Count III. (Id.).

And, on the morning of trial, Olga orally moved to dismiss Count V, which the Court granted. (Doc. ## 157, 158, 159). Trial proceeded as to the remaining Counts. (Doc. ## 153, 160, 161, 162, 164, 165). On December 17, 2015, at the close of Olga's case-in-chief, Michelle and Teresa moved for judgment as a matter of law pursuant to Rule 50. Tr. Transcript, vol. 4, at 44:15-55:11; (Pl.'s Ex. 163). The Court deferred ruling. Tr. Transcript, vol. 4, at 56:5-8. On December 18, 2015, Michelle and Teresa renewed their motion for judgment as a matter of law. Tr. Transcript, vol. 5, at 20:16-21:3. The Court deferred ruling, Id. at 21:1-2, and submitted the case to the jury, Id. at 136:17-20.

The jury returned a verdict on December 21, 2015. (Doc. # 167). Specifically, the jury found in favor of Olga, and against Michelle and Teresa, as to Olga's claim for exploitation of the elderly under the Florida Adult Protective Services Act (Count I). (Id. at 1-3). The jury awarded $127,669.64 to Olga against Michelle and $31,917.41 to Olga against Teresa. (Id. at 2-3). As to the remaining claims, the jury found in favor of Michelle and Teresa, and against Olga. (Id. at 4-9).

Michelle and Teresa were permitted to file additional briefing in support of their Rule 50 motion. Tr. Transcript, vol. 6, at 27:10-28:3; (Doc. # 173). Michelle and Teresa filed their supplemental memorandum, which was docketed as another motion for judgment as a matter of law, on January 20, 2016. (Doc. # 176). Olga was granted an extension of time to file her response, which was filed on February 17, 2016. (Doc. ## 178, 179). With leave of Court, Michelle and Teresa filed a reply on February 29, 2016. (Doc. ## 180, 181, 182). Michelle and Teresa's Rule 50 motion is ripe for review. For the reasons stated herein, the Court denies Michelle and Teresa's oral Rule 50 motion made on December 17, 2015, which was renewed on December 18, 2015, and their Rule 50 motion filed on January 20, 2016.

## II.  **Legal Standard**

"Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004). A court "consider[s] whether such sufficient conflicts exists in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law." Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000) (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999 (en banc)). "Judgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." King v. Volunteers of Am., N. Ala., Inc., 614 Fed. Appx. 449, 452 (11th Cir. 2015) (quoting Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001)).

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that the inquiry under each is the same." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, "in entertaining

a motion for judgment as a matter of law, the court should review all of the evidence in the record." Id. A court draws all reasonable inferences in the light most favorable to the non-moving party. Thews v. Wal-Mart Stores, Inc., 560 Fed. Appx. 828, 831 (11th Cir. 2014) (citing Cleveland, 369 F.3d at 1192-93).

Furthermore, a court "may not make credibility determinations or weigh the evidence." Reeves, 530 at 150. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown, 619 Fed. Appx. 923, 927 (11th Cir. 2015) (quoting Gowski v. Peake, 682 F.3d 1299, 1310 (11th Cir. 2012) (per curiam)) (internal quotation marks omitted). A court "'disregard[s] all evidence favorable to [the movant] that the jury [was] not required to believe.'" Vista Mktg., LLC v. Burkett, 812 F.3d 954, 962 (11th Cir. 2016) (quoting Reeves, 530 U.S. at 151) (third alteration in original). "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested

13

witnesses." <u>Reeves</u>, 530 U.S. at 151 (citation and internal quotation marks omitted).

"[A] jury may properly reconstruct a series of events by drawing inference upon an inference," so long as the inference relied on is reasonable. <u>Fenner v. Gen. Motor Corp.</u>, 657 F.2d 647, 650-51 (5th Cir. 1981).[2] Although "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts," <u>Abel</u>, 210 F.3d at 1337, "[t]he result reached must be left intact if there is evidence from which the decision maker, the jury in this instance, reasonably could have resolved the matter the way it did," <u>Rodriguez v. Farm Stores Grocery, Inc.</u>, 518 F.3d 1259, 1264 (11th Cir. 2008).

## III. **Analysis**

Michelle and Teresa raise a two-pronged argument in support of their Rule 50 motion: namely, there was insufficient evidence from which the jury could determine (A) Olga was a vulnerable adult (Doc. # 176 at 5-12) and (B) Michelle and Teresa exploited Olga (<u>Id.</u> at 12-25). The relevant statutory framework is laid out below.

---

[2] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all decisions of the former Fifth Circuit handed down before October 1, 1981, as binding precedent.

Olga's claim under Florida's Adult Protective Services Act, Sections 415.101-415.113, Florida Statutes, is addressed in Jury Instruction Number 6 (Doc. # 166 at 7-10).[3] Section 415.1111 states, in part: "[a] vulnerable adult who has been abused, neglected, or exploited as specified in this chapter has a cause of action against any perpetrator and may recover actual and punitive damages for such abuse, neglect, or exploitation." Fla. Stat. § 415.1111. The term "vulnerable adult" is defined to mean:

> a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging.

Fla. Stat. § 415.102(28).[4] In turn, the phrase "activities of daily living" means "functions and tasks for self-care, including ambulation, bathing, dressing, eating, grooming, toileting, and other similar tasks." Id. at § 415.102(2).

In addition, the term "exploitation" means a person who:

---

[3] Michelle and Teresa do not argue the jury was improperly instructed. See, e.g., (Doc. # 182 at 4 n.2).

[4] Section 415.102 was renumbered in 2015, so that "vulnerable adult," which was defined at Section 415.102(27), is now defined at Section 415.102(28). State Ombudsman Program-Citizens and Citizenship-Councils, 2015 Fla. Sess. Law Serv. Ch. 2015-31 (West). The definition did not change.

> 1. Stands in a position of trust and confidence with a vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult; or
> 2. Knows or should know that the vulnerable adult lacks the capacity to consent, and obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult.

Id. at § 415.102(8)(a). Furthermore, "exploitation"

> may include, but is not limited to:
> 1. Breaches of fiduciary relationships, such as the misuse of a power of attorney or the abuse of guardianship duties, resulting in the unauthorized appropriation, sale, or transfer of property;
> 2. Unauthorized taking of personal assets;
> 3. Misappropriation, misuse, or transfer of moneys belonging to a vulnerable adult from a personal or joint account; or
> 4. Intentional or negligent failure to effectively use a vulnerable adult's income and assets for the necessities required for that person's support and maintenance.

Id. at § 415.102(8)(b).

"Fiduciary relationship," in turn, means "a relationship based upon the trust and confidence of the vulnerable adult in the caregiver, relative, household member, or other person entrusted with the use or management of the property or assets of the vulnerable adult." Id. at § 415.102(11). Such a

"relationship exists where there is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the vulnerable adult." Id. Further, "a fiduciary relationship may be formed by an informal agreement . . . . A fiduciary relationship includes, but is not limited to, court-appointed or voluntary guardians, trustees, attorneys, or conservators of a vulnerable adult's assets or property." Id.

A.   **There was Sufficient Evidence from which the Jury Could Find that Olga was a "Vulnerable Adult"**

Michelle and Teresa challenge the sufficiency of the evidence as to whether Olga was a "vulnerable adult." Upon review of the record, the Court determines there was sufficient evidence from which the jury could find that Olga was a "vulnerable adult."

A person who is 18 years of age or older is considered a "vulnerable adult" under one of two circumstances. First, such a person is a "vulnerable adult" if his or her ability to perform the normal "activities of daily living" is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging. Fla. Stat. 415.102(28). Second, such a person is a "vulnerable adult" if his or her ability

17

to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging. Id. Notably, Olga was not required to prove inability to either perform the normal "activities of daily living" or provide for her own care or protection; rather, Olga was merely required to prove impairment of her ability to do so. See Fla. Stat. § 415.102(28).

There was evidence at trial that Olga had difficulty walking. In fact, Olga used a cane or walker. Tr. Transcript, vol. 2, at 38:5-15. Furthermore, Olga's impaired ability to ambulate was to such an extent that she was confined to the down-stairs portion of the house while in Oklahoma. Id. at 127:15-16. Moreover, Michelle and Teresa told Olga not to walk to the mailbox because she was likely to fall. See Id. at 97:8-11, 127:6-7. And, in preparing for Olga's arrival, Michelle and Teresa chose the down-stairs bedroom for safety reasons. Tr. Transcript, vol. 4, at 109:8-13. It was reasonable for the jury to find Olga's ability to ambulate was impaired.

Evidence at trial showed that Olga's ability to perform the normal "activities of daily living" or to provide for her own care or protection was impaired due to an emotional

18

dysfunction. For instance, Olga testified as to the profound effect the deaths of her husband and son, which occurred relatively close to each other temporally, had on her. Tr. Transcript, vol. 2, at 78:21-23, 92:12-93:13. Teresa also testified that Olga was grieving. Tr. Transcript, vol. 3, at 113:22-25. And, Fuller testified that Olga was, and continues to be, in a state of deep grief after her husband died. Tr. Transcript, vol. 1, at 77:4-8. Further, there was testimony that Olga looked "unhealthy" and "like a skeleton" on her return from Oklahoma because she had lost 50 pounds while in Oklahoma. Tr. Transcript, vol. 2, at 36:1-8, 221:8-12. It was reasonable for the jury to find that Olga's ability to either perform the normal "activities of daily living" or provide for her own care or protection was impaired due to an emotional dysfunction.

In challenging the sufficiency of the evidence as to whether Olga's ability to provide for her own care or protection was impaired, Michelle and Teresa raise an argument under *ejusdem generis*. (Doc. # 176 at 8 n.1). *Ejusdem generis* is a canon of statutory construction "holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Ejusdem*

19

*generis*, BLACK'S LAW DICTIONARY (10th ed. 2014). Florida courts apply this canon of construction. State v. Hearns, 961 So. 2d 211, 219 (Fla. 2007).

Section 415.102(28) states,

> a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging.

Fla. Stat. § 415.102(28). As can be seen, Section 415.102(28) begins with two disjunctive clauses. It is in addressing the second of these disjunctive clauses that Michelle and Teresa assert their *ejusdem generis* argument. (Doc. # 176 at 8 n.1). They argue that reading is not a function or task of self-care. (Id.). However, the phrase "functions and tasks for self-care" does not appear in Section 415.102(28). Rather, the phrase "functions and tasks for self-care" appears in Section 415.102(2), which defines the phrase "activities of daily living." The phrase "activities of daily living," in turn, is contained in the first disjunctive clause of Section 415.102(28), not the second.

The second disjunctive clause of Section 415.102(28) uses the phrase "own care or protection," not "functions and

tasks for self-care." The phrase "own care or protection" is not defined by the statute.

To read "functions and tasks for self-care" and "own care or protection" as having the same meaning would be to render the second disjunctive clause redundant. But, "[n]o words should be treated as redundant or useless." Crews v. State, 183 So. 3d 329, 336 (Fla. 2015). "Every word in a statute should be given effect, and constructions should be avoided that would render any words superfluous." Id. at 335. "[I]t is axiomatic that all parts of a statute must be read together in order to achieve a consistent whole." Fla. Dep't of Children & Family Servs. v. P.E., 14 So. 3d 228, 234 (Fla. 2009) (citation and internal quotation marks omitted).

To accept Michelle and Teresa's *ejusdem generis* argument would be to render the second disjunctive clause the equivalent of the definition of the first; that is, it would be to render the second disjunctive clause redundant. Instead, the Court construes the phrase "own care or protection" according to its ordinary meaning. See Nehme v. Smithkline Beecham Clinical Labs., Inc., 863 So. 2d 201, 204-05 (Fla. 2003) (stating, "'we give statutory language its plain and ordinary meaning, unless words are defined in the

statute or by the clear intent of the legislature'" (quoting Green v. State, 604 So. 2d 471, 473 (Fla. 1992))).

The jury was presented with sufficient evidence to find that Olga's limited ambulatory capabilities, her emotional dysfunction stemming from a state of deep grief, and auditory and visual (that is, sensory) dysfunctions, whether viewed independently or cumulatively, impaired her ability to provide for her own care or protection. As noted, Olga's ambulatory capabilities were limited to the point that she used a cane or walker at least part of the time and was confined to the down-stairs portion of the house in Oklahoma. In addition, Olga was still reeling from the deaths of her husband and son. There was also testimony and evidence relating to Olga's poor hearing and vision.

As to hearing, Fuller testified that Olga's hearing was "terrible" when she returned from Oklahoma. Tr. Transcript, vol. 2, at 37:21-24. Likewise, Robert testified that Olga's hearing was "no good" when she returned to Florida. Id. at 221:8-16. Olga even provided testimonial evidence from which the jury could infer that Michelle and Teresa were aware of Olga's impaired ability to hear. See Id. at 97:7-11. A jury could reasonably infer from this evidence that Olga's hearing was impaired while she lived in Oklahoma.

With respect to Olga's vision, Dr. Cohen's reports established that Olga's vision worsened over time. As shown by those reports, Olga's visual acuity in February of 2010, was 6/200 (left eye) and 20/70 (right eye), and in January of 2011, her visual acuity had decreased to 3/200 (left eye) and 20/80 (right eye). (Pl.'s Ex. 90). Dr. Cohen's reports also demonstrate that Olga suffered from age-related macular degeneration and a vitreous hemorrhage in her left eye. (Id.).

Olga herself testified that her vision was the same at trial as it was while she was in Oklahoma. Tr. Transcript, vol. 2, at 108:8-109:4. Olga also explicitly stated that "she could not see" and "couldn't go around reading anything." Id. at 107:20-23, 127:3-7. Fuller, Robert, Ciolli, and Fleece all testified that Olga had difficultly seeing. Id. at 37:3-10, 276:11-12; Tr. Transcript, vol. 3, at 22:16-17, 273:21-25. Although some conflict in testimony existed as to whether Olga could read, see, e.g., Tr. Transcript, vol. 2, at 100:12-24, that conflict merely created an issue for the jury to decide.

In sum, there was sufficient evidence from which the jury could find that Olga's ability to either perform the normal "activities of daily living" or provide for her own care or protection was impaired due to one of the enumerated

conditions within Section 415.102(28). Simply put, there was sufficient evidence from which the jury could find that Olga was a "vulnerable adult."

### B. There was Sufficient Evidence from which the Jury Could Find that Michelle and Teresa Exploited Olga

Michelle and Teresa also challenge the sufficiency of the evidence as to the issue of exploitation. After a review of the record, the Court determines there was sufficient evidence for the jury to reach the conclusion that it did.

"Exploitation" means

> a person who . . . [s]tands in a position of trust and confidence with a vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult.

Fla. Stat. § 415.102(8)(a)(1). "Exploitation" includes, but is not limited to, breaches of fiduciary relationships. Id. at 415.102(8)(b). A fiduciary relationship is "[a] relationship based upon the trust and confidence of the vulnerable adult in the caregiver, relative, household member, or other person entrusted with the use or management of the property or assets of the vulnerable adult." Id. at § 415.102(11).

Michelle and Teresa focus on Olga's testimony, which they characterize as showing only that she did not know or could not remember facts related to Michelle and Teresa's involvement in the execution of the trusts. But, there was other evidence from which the jury could find that Michelle and Teresa exploited Olga.

To begin with, there was evidence that Michelle and Teresa stood in a position of trust and confidence with Olga. Of course, evidence was received that showed Michelle and Teresa were Olga's granddaughters. Tr. Transcript, vol. 4, at 102:18-20, 159:11-13; see also Tr. Transcript, vol. 2, at 76:9-15, 23-77:1. Additionally, testimony established that there was a close familial relationship between Olga and her granddaughters. See, e.g., Tr. Transcript, vol. 4, at 64:1-8, 162:7-9. Michelle even testified that Olga was like a second mother to her. Tr. Transcript, vol. 3, at 32:10-11, 223:16-21. The preceding evidence was sufficient to serve as a basis for inferring a close familial relationship wherein Olga reposed trust and confidence in Michelle and Teresa.

Furthermore, Michelle admitted to having a formal fiduciary relationship with Olga. Id. at 148:24-149:1, 152:15-18. Michelle was also the trustee of Olga's irrevocable trust. (Pl.'s Ex. 47). As to Teresa, she drafted

Olga's will and was also named as a successor executor. Tr. Transcript, vol. 3, at 104:5-105:12; (Pl.'s Ex. 20). At a minimum, this is evidence tending to suggest that Olga placed trust and confidence in Teresa.

"Exploitation" occurs when a person in a position of trust and confidence obtains or uses, or even endeavors to obtain or use, a vulnerable adult's funds, assets, or property. Fla. Stat. § 415.102(8)(a)(1). There was evidence at trial that could form the basis of the jury's finding of exploitation. For example, Michelle and Teresa witnessed a form that sought to name Margaret as the income beneficiary of Olga's annuity. (Pl.'s Ex. 40, 48, 49, 50). Donovan's billing records show some level of involvement on Michelle's part in revising Olga's trust. (Pl.'s Ex. 55). Donovan's records further show that Michelle and Teresa met with Donovan to discuss Olga's trust. Tr. Transcript, vol. 3, at 118:24-119:9. And, Teresa admitted to taking Olga's will from her condominium. Id. at 105:13-19.

The evidence further demonstrated that Michelle attempted to obtain a debit card in her name linked to Olga's checking account (Pl.'s Ex. 54), attempted to have Olga's CD made transferable on death into the trust (Pl.'s Ex. 39), and sent an email suggesting she was involved in making Olga's

trust irrevocable (Pl.'s Ex. 89 at 93). In addition, Desmond testified Teresa dropped off an affidavit that, if signed, would have aided Michelle in her capacity as trustee in the Trust Litigation. Tr. Transcript, vol. 4, at 28:8-17.

Fleece also provided testimony that could support the jury's verdict; viz.,

> Q. Did Olga Grasso ever indicate to you in words or substance that she believes that she was tricked into signing those documents and that they were never explained to her?
> A. Yes, sir.

Tr. Transcript, vol. 3, at 282:20-23. On cross-examination, Fleece testified Olga reached her conclusion that she had been tricked because she did not remember signing the documents. Id. at 283:16-284:23.

In sum, there was sufficient evidence from which the jury could find that Michelle and Teresa exploited Olga.

## IV.  Conclusion

The Court determines there was a sufficient evidentiary basis for the jury to find that Olga was a "vulnerable adult" and that Michelle and Teresa exploited Olga. In reaching this conclusion, the Court is mindful that it cannot weigh the evidence, nor make credibility determinations, and must draw all reasonable inferences in favor of Olga.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants Michelle Grasso and Teresa Grasso's Motion for Judgment as a Matter of Law (Doc. # 176) is **DENIED**.

(2)   Defendants Michelle and Teresa Grasso's oral motion for judgment as a matter of law (Doc. # 163), which was renewed on December 18, 2015, Tr. Transcript, vol. 5, at 20:21-22, is **DENIED**.

(3)   Consistent with the verdict, the Clerk is directed to enter judgment in favor of Olga T. Grasso and against Michelle Grasso in the amount of $127,669.64, plus post-judgment interest at the federal statutory rate from the date of judgment, for which sum let execution issue.

(4)   Consistent with the verdict, the Clerk is directed to enter judgment in favor of Olga T. Grasso and against Teresa Grasso in the amount of $31,917.41, plus post-judgment interest at the federal statutory rate from the date of judgment, for which sum let execution issue.

(5)   Once judgment has been entered, the Clerk shall **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 31st day of March, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE